**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LOVE ALTONIO BROOKS** | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-04-2680** |
| | : | **(JUDGE VANASKIE)** |
| **JOSEPH V. SMITH, TROY LEVI,** | : | |
| **R. HOEKMAN, K. GABRIELSON,** | : | |
| **M. RIOS, J. RODGERS** | : | |
| **Defendants** | : | |

**MEMORANDUM**

This matter is before the Court following a non-jury trial to determine whether Plaintiff

Love Altonio Brooks has established by a preponderance of the evidence that certain prison

officers and employees retaliated against him for exercising First Amendment rights.  Mr. Brooks

brought this civil rights action under the authority of Bivens v. Six Unknown Named Agents of

Federal Bureau of Narcotics, 403 U.S. 388 (1971), alleging that officers and employees at the

United States Penitentiary at Lewisburg ("USP-Lewisburg") retaliated against him for filing a

lawsuit and administrative grievances.[1]  Ultimately, a nonjury trial was conducted on two claims:

(1) Defendant Jeffrey Rodgers ("Officer Rodgers") allegedly placed a cardboard sign in Mr.

Brooks' prison cell window labeling him a "snitch" in retaliation for previously filing an

administrative grievance against Officer Rodgers; and (2) Defendants Troy Levi ("A.W. Levi") and

Kenneth Gabrielson ("Lt. Gabrielson") allegedly placed Mr. Brooks in the USP-Lewisburg Special

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Housing Unit ("SHU") in retaliation for filing a federal civil rights lawsuit and administrative grievances against USP-Lewisburg staff.

After considering the testimony and documents presented at the trial, the Court finds that Mr. Brooks has not proven his retaliation claim against Officer Rodgers. Specifically, Mr. Brooks did not establish a casual link between an administrative grievance filed on April 17, 2003, and the cardboard sign that was posted approximately one year later. The Court concludes, however, that Mr. Brooks has proven his retaliation claim against A.W. Levi and Lt. Gabrielson. Mr. Brooks' placement in the SHU constituted adverse action, and the evidence demonstrated that his lawsuit and administrative grievances were a "substantial or motivating factor" for the decision to place him in that restricted confinement. Because the Prison Litigation Reform Act bars Mr. Brooks' claim for compensatory damages, and the evidence does not support the imposition of punitive damages, he is entitled only to nominal damages of $1.

## I. <u>BACKGROUND</u>

### A. <u>Procedural History</u>

Mr. Brooks commenced this civil rights action on December 13, 2004. (Dkt. Entry 1.) His complaint named as Defendants A.W. Levi, Lt. Gabrielson, Officer Rodgers, Joseph V. Smith ("Warden Smith"), Raymon Hoekman ("Agent Hoekman"), and M. Rios. Mr. Brooks asserted three claims of retaliation. First, he complained that Officer Rodgers placed a cardboard sign in his cell door window labeling him a "snitch" in retaliation for filing an administrative grievance

against Officer Rodgers for an alleged inappropriate pat search.  Second, Mr. Brooks complained

that he was placed in the SHU in retaliation for filing a federal lawsuit and administrative

grievances.  Mr. Brooks asserted this claim against all Defendants.  Third, he claimed that he

was transferred to another prison in retaliation for his lawsuit and administrative grievances.

This claim was asserted against all Defendants as well.  Plaintiff requested "$3,000,000 from the

defendant[s]" for their alleged retaliatory acts.  (Compl., Dkt. Entry 1, at 3.)

On April 13, 2005, Defendants moved to dismiss the complaint or, in the alternative, for

summary judgment.  (Dkt. Entry 15.)  Magistrate Judge J. Andrew Smyser, to whom this matter

was referred for pretrial management, recommended that summary judgment be granted to all

Defendants on the retaliatory transfer claim, and that summary judgment be granted in favor of

Defendants Smith, Rodgers, Hoekman, and Rios on the claim of retaliatory SHU placement.

(Dkt. Entry 29, at 15-16, 19.)  Judge Smyser recommended that summary judgment be denied,

however, as to A.W. Levi and Lt. Gabrielson on the SHU placement claim.

Defendants objected to this latter recommendation.  (Dkt. Entry 32.)  The Court overruled

Defendants' objection and adopted Judge Smyser's recommendation in its entirety.[2]  (Dkt. Entry

35.)

This matter was subsequently listed for trial.  A final pre-trial conference was held the

---

[2]Judge Smyser did not consider the retaliation claim against Officer Rodgers because
Defendants failed to address this claim in the brief in support of their motion.  (See Report &
Recommendation of Sept. 26, 2005, Dkt. Entry 29, at 7 n.3.)

morning of July 18, 2007, the day of trial.  At the conference, the Court dismissed Mr. Brooks'

claim for compensatory damages.[3]  (Trial Tr., July 18, 2007, Dkt. Entry 78, at 12.)  Under the

Prison Litigation Reform Act ("PLRA"), a prisoner may recover compensatory damages for

mental or emotional injury only where there is actual physical injury.  See 42 U.S.C. § 1997e(e).

Mr. Brooks alleged that he suffered headaches from the stress of his confinement in SHU, but

otherwise alleged no actual physical injury.  The Court determined that headaches are not

compensable in the absence of an actual physical injury.  (Trial Tr. 11.)  See also Gobert v.

Leonard, Civ. A. No. G-06-295, 2006 WL 2062131, at *2 (N.D. Tex. July 10, 2006) (plaintiff's

claim for damages related to anxiety, stress, and headaches do not satisfy PLRA's physical

injury requirement); Cannon v. Burkybile, No. 99-C-4623, 2000 WL 1409852, at *6 (N.D. Ill. Sept.

25, 2000) (same).  As such, the Court ruled Mr. Brooks' recovery, if any, will be limited to

nominal and punitive damages.[4]  (Trial Tr. 12.)  See also Allah v. Al-Hafeez, 226 F.3d 247, 251-

---

[3]The Court clarified two other items during the final pre-trial conference.  First, the Court dismissed any retaliation claim premised on pat searches and cell searches as such conuct could not serve as the requisite "adverse action" to support a retaliation claim.  (Trial Tr. 4-5.) Second, the Court dismissed any claim based solely on Officer Rodgers' allegedly inappropriate pat search.  (Id. at 6.)

[4]Mr. Brooks did not expressly request nominal damages or punitive damages in his complaint.  However, Mr. Brooks' pro se complaint is entitled to a liberal construction, and his prayer for relief – "For retaliation against me for exercising my constitutional rights I ask for $3,000,000 from the defendant[s]" – can be construed to request nominal, compensatory, and punitive damages.  See Allah v. Al-Hafeez, 226 F.3d at 251 (formal request for nominal damages unnecessary, and, moreover, liberal construction of pro se complaint permits interpretation that nominal damages were requested); Kyle v. Patterson, 196 F.3d 695, 697 (7th Cir. 1999) (pro se

52 (3d Cir. 2000) (PLRA does not bar recovery of nominal and punitive damages).

At the nonjury trial, the Court heard testimony from Mr. Brooks, A.W. Levi, Lt. Gabrielson, Officer Rodgers, Agent Hoekman, Dr. Jennifer L. Hunter, and John Keim.  The Court also received exhibits from both Mr. Brooks and Defendants.  This matter is now ripe for disposition.

### B. Findings of Fact

Pursuant to Federal Rule of Civil Procedure 52(a), the Court finds the following facts:

1.  At all times relevant to his claims, Mr. Brooks was incarcerated at USP-Lewisburg. Mr. Brooks is a convicted felon serving two terms of life imprisonment plus an additional prison term of fifty years.  (Trial Tr. 57.)

2.  A.W. Levi was the Associate Warden over the Custody Department at USP-Lewisburg in May, 2004.[5]  (Id. at 88, 122.)  As Associate Warden, A.W. Levi was responsible for evaluating and monitoring inmate routines and staff performance and ensuring that both conformed to the policies of the Bureau of Prisons.  (Id. at 122-23.)  A.W. Levi was authorized to place inmates in SHU.  (Id. at 123.)  He worked at USP-Lewisburg for three-and-one-half years.  (Id. at 122.)

3.  Gabrielson was a lieutenant at USP-Lewisburg in May, 2004.  (Id. at 71-72.)  Lt. Gabrielson held several supervisory positions at USP-Lewisburg, including Hospital Escort

---

complainant's prayer for "$1 million in 'monetary relief' . . . can reasonably be viewed as covering punitive damages to which he might be entitled").

[5]The Defendants will be identified according to the positions held at the time of the events underlying this litigation.

Lieutenant, Activities Lieutenant, Special Housing Unit Lieutenant, Bus Lieutenant, and, as

relevant here, Operations Lieutenant.  (Id. at 72.)  As Operations Lieutenant, Gabrielson was a

shift supervisor responsible for maintaining a safe and secure environment for staff and inmates.

(Id.)  He was authorized to place inmates in the SHU.  (Id. at 34.)  Lt. Gabrielson worked at USP-

Lewisburg for approximately five years.  (Id. at 71.)

4.  Officer Rodgers is a senior officer at USP-Lewisburg, a position he has held since at

least April 13, 2003.  (Id. at 91.)  As a senior officer, Rodgers is responsible for ensuring the safe,

secure, and orderly operation of USP-Lewisburg by conducting pat searches, cell searches,

security checks, and sanitation checks, among other things.  (Id.)  Officer Rodgers has worked at

USP-Lewisburg for approximately eleven-and-one-half years.  (Id. at 90-91.)

5.  On April 13, 2003, Mr. Brooks was pat searched by Officer Rodgers after passing

through a metal detector.  (PX-12.)[6]  Mr. Brooks believed the pat search improper and, on April

17, 2003, filed Request for Administrative Remedy number 296800-F1.  (Trial Tr. 50; PX-12.)

Mr. Brooks claimed the pat search was sexual in nature because Officer Rodgers "shoved" his

hands into Mr. Brooks' crotch area.  (PX-12.)

6.  The administrative grievance was investigated.  Officer Rodgers was interviewed and

denied placing his hands into Mr. Brooks' crotch area.  (PX-13.)  On May 7, 2003, an

---

[6]"PX-_" and "DX-_" will refer to the trial exhibits introduced by Mr. Brooks and Defendants,
respectively, and admitted into evidence.

Administrative Remedy Response was issued denying Mr. Brooks' request for relief because there was no evidence supporting his allegations.  (Id.)  Mr. Brooks appealed this determination to the Northeast Regional Director of the Bureau of Prisons, and the appeal was denied.  (DX-B, at 5-6.)

7.  Officer Rodgers never conducted a pat search of Mr. Brooks after the April 13, 2003, incident.  (Trial Tr. 60.)

8.  In or about the week preceding April 23, 2004, Mr. Brooks returned to his prison cell and found a cardboard sign in his cell door window.  (Id. at 50, 65.)

9.  The cardboard sign contained writing on its front and back sides.  (Id. at 50.)  On one side was written "Hanging This Cardboard in the Window means I'm a snitch"; on the other side, "Only Snitches Hang This in the Window."  (PX-6.)

10.  A "snitch" is an inmate who cooperates with prison authorities.  (Trial Tr. 28.)  An inmate known as a "snitch" is subject to adverse treatment by other inmates, and, at the very least, will be humiliated and his reputation tarnished.  (Id.)

11.  Mr. Brooks was not regarded as a "snitch" by other inmates at USP-Lewisburg.  (Id. at 58.)

12.  No other inmates observed or commented to Mr. Brooks about the cardboard.  (Id.)

13.  Mr. Brooks did not see who posted the cardboard in his cell door window.  (Id. at 65.) Mr. Brooks was advised by fellow inmate McKnight that Officer Rodgers was in Mr. Brooks' cell

7

around the time the cardboard sign was posted.  (Id. at 52, 57-58.)

14.  Mr. Brooks suspected Officer Rodgers was responsible for the cardboard because of Mr. McKnight's statement and because the cardboard identified Mr. Brooks as a "snitch," and he previously filed an administrative grievance against Officer Rodgers.  (Id. at 51.)  Furthermore, Officer Rodgers routinely entered inmates' cells and left messages.  (Id. at 52, 58.)

15.  Mr. Brooks filed an administrative grievance in connection with the cardboard sign. He initially filed a grievance with the Northeast Regional Office of the Bureau of Prisons contending the issue was sensitive.  (Id. at 52; PX-7.)  The Northeast Regional Office rejected Mr. Brooks' grievance in a notice dated April 29, 2004, and mailed April 30, 2004, because the issue raised was not sensitive, the request was submitted to the wrong level, and the request must be filed first through USP-Lewisburg.  (PX-7.)

16.  Mr. Brooks heeded the rejection notice and filed Request for Administrative Remedy number 332596-F1, dated May 5, 2004, and submitted May 7, 2004, complaining about the cardboard sign.  (Trial Tr. 52; PX-5.)

17.  An investigation was undertaken by Special Investigative Agent Raymon Hoekman, who concluded there was insufficient evidence to substantiate Mr. Brooks' claim that Officer Rodgers posted the cardboard sign in his cell door window.  (Trial Tr. 23-24, 99.)

18.  The cardboard sign was posted in Mr. Brooks' cell door window approximately one year after he filed the administrative grievance against Officer Rodgers.  (Id. at 65.)  There was

no hostility between Mr. Brooks and Officer Rodgers over the intervening year, and Mr. Brooks was surprised that Officer Rodgers would post the cardboard given the absence of hostility.  (Id. at 51.)

19.  On April 12, 2004, Mr. Brooks filed a complaint in this Court against numerous officials at USP-Lewisburg.  See Brooks v. Newton, No. 3:04-CV-792 (M.D. Pa.).  Mr. Brooks alleged that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by denying medical treatment for tonsillitis.  (Trial Tr. 53.)  None of the Defendants named in this action were named defendants in that action.  (See DX-F (docket sheet listing the Defendants in No. 3:04-CV-792).)

20.  Also on April 12, 2004, Mr. Brooks filed an informal resolution attempt against John Keim, a senior officer specialist at USP-Lewisburg.  (DX-D, at 1; Trial Tr. 104)  Officer Keim was assigned to "I-Block" unit, where Mr. Brooks was housed, and he was responsible for making rounds and conducting pat searches to maintain a secure unit.  (Trial Tr. 104-05.)

21.  Mr. Brooks complained that Officer Keim failed to conduct adequate rounds on April 10, 2004.  (DX-D, at 1.)  An officer is to make rounds every fifteen minutes, and Mr. Brooks alleged that Officer Keim made rounds no more than once per hour.  (Id.)  Mr. Brooks complained that Officer Keim's "lack of duty is a danger to every inmate in the I-Block unit."  (Id.)  Officer Keim was apparently questioned, and he stated that he makes rounds throughout the I-Block unit "several times a night."  (Id. at 2.)

9

22.  Unsatisfied, on April 16, 2004, Mr. Brooks filed Request for Administrative Remedy number 331321-F1, reiterating his complaints expressed in the informal resolution.  (Id. at 3; PX-9.)

23.  Mr. Brooks additionally filed Request for Administrative Remedy number 331319-F2 against Officer Keim, alleging he was smoking in an area where smoking is prohibited.  (PX-10.)[7]

24.  On May 5, 2004, Warden Smith issued an Administrative Remedy Response to administrative grievance number 331321-F1, denying relief.  (DX-D, at 4.)  The warden determined that Officer Keim conducted adequate rounds on April 10, 2004.  (Id.)  The investigation purportedly included an interview of Officer Keim, (id.), although Officer Keim denies being questioned about his rounds.  (Trial Tr. 105.)

25.  During a fourteen-day period sometime between April 16, 2004, and May 4, 2004, Mr. Brooks was subjected to five pat searches and one cell search by Officer Keim and one cell search by Officer Rodgers.  (PX-5.)  Officers Keim and Rodgers are friends.  (Id.)  These searches occurred around the time the cardboard was posted in Mr. Brooks' cell door window.  Mr. Brooks complained about these searches in his administrative grievance filed in connection with the cardboard.  (Id.)

26.  Sometime between April 16, 2004, and May 3, 2004, Mr. Brooks telephoned Felicia Thompson, the mother of his son.  He advised her that if she did not hear from him within a

---

[7]The disposition of this grievance is unknown.

certain period of time (one to two weeks), there is a high probability he would be in the SHU. (Trial Tr. 53, 62.)  He explained that he would be placed in the SHU, in part, because of his administrative grievances against Officer Keim, and in part, because of his federal civil rights lawsuit.  (Id.)  He instructed Ms. Thompson that, if he was in the SHU, to "just ask about Officer Rodgers and Officer Keim."  (Id. at 62.)  He never told Ms. Thompson that he was being harassed by Officer Rodgers.  (Id.)

27.  On or before May 3, 2004, Ms. Thompson called USP-Lewisburg expressing concern about Mr. Brooks' safety.  (Id. at 63.)  Ms. Thompson expressed a generalized concern for Mr. Brooks' safety.  (Id. at 73, 113.)  A.W. Levi was advised of this phone call during a staff meeting on May 3, 2004.  (Id. at 124.)

28.  As of May 4, 2004, A.W. Levi knew of Mr. Brooks' federal civil rights complaint and the two administrative grievances filed against Officer Keim.  (Id. at 54.)

29.  On the morning of May 4, 2004, A.W. Levi decided to confront Mr. Brooks.  He told Lt. Gabrielson about the phone call from Ms. Thompson.  (Id. at 73.)  He ordered Lt. Gabrielson to summon Mr. Brooks to the lieutenant's office.  (Id. at 126.)  Mr. Brooks was located and instructed to go to the lieutenant's office, and he complied.  (Id. at 32, 73.)

30.  The lieutenant's office is not a large office, with space for only three or four desks. (Id. at 132, 136.)

31.  When Mr. Brooks entered the lieutenant's office, only Lt. Gabrielson was present.  He

11

asked Lt. Gabrielson why he was summoned, and Lt Gabrielson claimed he did not know the

reason.  (Id. at 54.)  A.W. Levi then entered the lieutenant's office, holding the two administrative

grievances filed by Mr. Brooks against Officer Keim.  (Id.; see also PX-9 & PX-10.)  A.W. Levi

unleashed a verbal assault, stating, "I'm getting sick and tired of your little write-ups and lawsuits

against my staff members."  (Trial Tr. 54.)  A.W. Levi then interrogated Mr. Brooks about his

allegation that Officer Keim was conducting inadequate rounds.  (Id.)  Mr. Brooks denied that he

was afraid of anyone.  (Id.)  At that point, A.W. Levi and Lt. Gabrielson decided to place Mr.

Brooks in the SHU.  (Id. at 73.)  "Well, we gonna put you in the hole for a little while," said A.W.

Levi, "and see if you'll cool off and change your mind."  (Id. at 54.)

32.  Lt. Gabrielson prepared an administrative detention order for Mr. Brooks.  He gave

Mr. Brooks the option of signing the detention order to indicate he requested placement in the

SHU; Mr. Brooks refused.  (Id. at 73.)  As a result, Lt. Gabrielson checked the part of the order

that purports to show that Mr. Brooks was placed involuntarily in administrative detention out of

concern for his safety.  (See PX-4 ("[Mr. Brooks] [i]s to be admitted to Administrative Detention . .

. [s]ince a serious threat exists to [Mr. Brooks'] safety as perceived by staff, although [Mr.

Brooks] has not requested admission."); id. ("You are being placed in administrative detention for

your own protection.").)  Lt. Gabrielson completed the administrative detention order in this

matter knowing that Mr. Brooks was being placed in the SHU to "cool off and change [his] mind"

about the lawsuit and administrative grievances.

33. Mr. Brooks was handcuffed in the lieutenant's office and escorted to the SHU. (Trial Tr. 74, 116.)

34. It is not standard procedure to place an inmate in the SHU because he filed an administrative grievance against a staff member. (Id. at 114.) It is common, however, for an inmate who perceives danger from another inmate, or whom staff believe to be in danger from another inmate, to be placed in the SHU, either voluntarily or involuntarily. (Id. at 76-77.)

35. On May 5, 2004, Warden Smith issued an Administrative Remedy Response, denying administrative grievance number 331321-F1. (DX-D, at 4.) He concluded Officer Keim conducted adequate rounds. (Id.) Although Defendants maintain that the issues presented in this grievance were a basis for Mr. Brooks' placement in the SHU, Mr. Brooks was not released from restricted confinement at this time.

36. On May 7, 2004, Mr. Brooks filed Request for Administrative Remedy number 332596-F1, complaining about the cardboard found in his cell and the pat searches and cell searches conducted by Officers Keim and Rodgers. (Trial Tr. 52; PX-5.) Mr. Brooks reported:

> Some time ago I found a cardboard in my window. I was unsure where it came from. I was in I-blk, cell 213. A copy of the cardboard is enclosed with this form. Four copies to be exact. For some time I've had a problem with Officer Rogers [sic]. I wrote him up for harassment and sexual assault. Now recently his friend Officer Keim has been harassing me. He physically searched me five times in 14 days and the cell 213 twice. Rogers [sic] searched the cell once in between the 14 days. If you compare the handwriting you will find a match, I did. This is why my family is worried for my safety. No inmate is harassing

me now, or-ever for that matter.

(PX-5.)

37.  Agent Hoekman apparently investigated grievance number 332596-F1 and
determined the allegations unfounded.  (Id. at 21, 23, 25-26, 99.)  Unlike the other requests for
administrative remedies, Warden Smith did not issue an administrative remedy response.

38.  Mr. Brooks first challenged his placement in the SHU when he appealed the denial of
administrative grievance number 331321-F1 to the Northeast Regional Office.  Mr. Brooks
argued that he never expressed concern for his safety when challenging the adequacy of
Officer's Keim's rounds, and that his placement in SHU was improper.  (DX-D, at 5.)  On June
18, 2004, the Northeast Regional Director issued a response, declining to consider this issue
because it was not presented to USP-Lewisburg in the first instance.  (Id. at 6.)

39.  On June 19, 2004, Mr. Brooks filed Request for Administrative Remedy number
335609-F1.  (PX-8.)  He reported that he was escorted to the lieutenant's office on May 4, 2004,
where A.W. Levi stated he was tired of Mr. Brooks' administrative grievances and placed him in
the SHU as punishment for filing administrative grievances.  (Id.)

40.  On July 6, 2004, Warden Smith issued an Administrative Remedy Response,
denying grievance number 335609-F1.  (PX-1.)  Warden Smith explained that an investigation
revealed Mr. Brooks submitted a request for administrative remedy on May 4, 2004, claiming
"that a staff member was continuously harassing you by conducting numerous pat searches on

14

your person in which you claim were sexual in nature [and] that you fear for your safety around this staff member.  Therefore, you were remanded to the Special Housing [Unit] pending the outcome of an investigation." (Id.)  Warden Smith noted that staff members denied placing Mr. Brooks in the SHU because of his administrative grievances.  (Id.)  Warden Smith concluded there was no evidence to substantiate Mr. Brooks' claim that his placement in the SHU was punishment for filing administrative grievances.  (Id.)

41.  The July 6, 2004, administrative remedy response fails to mention as a basis for Mr. Brooks' placement in the SHU the phone call from Ms. Thomson or Mr. Brooks' administrative grievance against Officer Keim for inadequate rounds.  Moreover, contrary to the statement in the Warden's response, Mr. Brooks never filed a request for administrative remedy on May 4, 2004.

42.  A.W. Levi and Lt. Gabrielson were not interviewed during the investigation into administrative grievance number 335609-F1.  (Trial Tr. 43, 108.)

43.  Mr. Brooks was in the SHU for approximately three-and-one-half months.  (Id. at 64.)

44.  Inmates confined in SHU have reduced access to personal property, telephone calls, and recreation, and reduced interaction with other inmates.  (Id. at 45, 53, 64.)

45.  Inmates confined in SHU also have reduced access to legal materials and limited ability to file administrative grievances.  Inmates are permitted access to the law library, but they must sign a waiting list and stand by until their turn arrives.  (Id. at 80.)

46.  Confinement in the SHU exacerbates the stressful nature of the prison environment. (Id. at 45.)  Additionally, there is a greater tendency among inmates to attempt suicide while confined in SHU than general population.  (Id.)  Because of the increased stress, an inmate's confinement in the SHU is reviewed every thirty (30) days.  (Id. at 45-46.)

47.  Mr. Brooks experienced stress and depression while confined in the SHU.  Dr. Jennifer Hunter, a psychologist at USP-Lewisburg, provided Mr. Brooks with reading material that contained stress management strategies.  (Id. at 46-47.)

48.  During the period Mr. Brooks was confined in SHU, he filed four documents in his federal civil rights lawsuit.  (See DX-F (Dkt. Entries 11 (filed May 27, 2004), 14 (filed June 7, 2004), 21 (July 14, 2004), 22 (July 20, 2004).)  He also filed five administrative grievances: Request for Administrative Remedy number 332596-F1 on May 7, 2004, although it is dated May 5, 2004, (PX-5; see Trial Tr. 52); Regional Administrative Remedy Appeal number 331321-R1 on May 9, 2004, (DX-D, at 5); Request for Administrative Remedy number 335609-F1 on June 19, 2004, (PX-8); Central Office Administrative Remedy Appeal number 331321-A1 on June 21, 2004, (DX-D, at 7); and Request for Administrative Remedy number 340848-F1 some time after June 12, 2004.  (See PX-2.)

## II. DISCUSSION

### A. Governing Legal Principles

The First Amendment to the United States Constitution protects an individual's right "to

16

petition the Government for a redress of grievances."  U.S. Const. am. I.  The amendment,

however, provides protection beyond proscribing the abridgment of an individual's right to

petition the government; it also prohibits the government from retaliating against an individual

who has elected to exercise his or her constitutional rights.  See,e.g., Rankin v. McPherson, 483

U.S. 378, 383-84 (1987); Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Without this complementary protection, the government could impermissibly chill First

Amendment activity through punishment and retaliation.  See Crawford-El v. Britton, 523 U.S.

574, 589 n.10 (1998) ("The reason why such retaliation offends the Constitution is that it

threatens to inhibit exercise of the protected right.").

        A prisoner does not relinquish First Amendment rights the moment he sets foot in the

institution, see e.g., Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981), but the rights are

diminished in the prison environment, where resolution of constitutional claims requires the

consideration of legitimate penological interests.  See Mincy v. Chmielewski, Civ. A. No. 1:05-

CV-0292, 2007 WL 707344, at *5 (M.D. Pa. Mar. 2, 2007) (citing Turner v. Safley, 482 U.S. 78,

89 (1987)); see also Cooper v. Tard, 855 F.2d 125, 128 (3d Cir. 1988).  Nevertheless, "'persons

in prison, like other individuals, have the right to petition the Government for redress of

grievances,'" and when not inconsistent with legitimate penological interests, this right "must be

freely exercisable without hind[r]ance or fear of retaliation."  Milhouse, 652 F.2d at 373-74

(quoting Cruz v. Beto, 405 U.S. 319, 321 (1972)).

In Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001), our Court of Appeals set forth the elements of a prisoner's claim for retaliation.  "As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected."  Id. at 333.  In this matter, Mr. Brooks contends he was subject to retaliation because he filed a federal civil rights lawsuit and administrative grievances.  The filing of a lawsuit and administrative grievances is constitutionally protected conduct.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Allah v. Seiverling, 229 F.3d 220, 224 (3d Cir. 2000); Branch v. Russian, No. Civ. A. 1:00-CV-1728, 2005 WL 1137879, at *6 (M.D. Pa. Feb. 1, 2005). Defendants concede that Mr. Brooks engaged in constitutionally protected conduct.  Accordingly, Mr. Brooks has met the first element of a retaliation claim.

Next, the prisoner must prove he suffered some "adverse action."  Rauser, 241 F.3d at 333.  Action is adverse if it "'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'"  Id. (quoting Allah, 229 F.3d at 225).  The retaliatory act may be actionable even though the act, standing alone, does not transgress the constitution.  Allah, 229 F.3d at 224.  Moreover, the test for adverse action is objective, not subjective, and whether the plaintiff was actually deterred by the defendant's retaliatory acts is not dispositive.  See Citizens for a Better Lawnside, Inc. v. Bryant, Civ. No. 05-4286 (RBK), 2007 WL 1557479, at *5-6 (D.N.J. May 24, 2007).  Put differently, the defendant does not escape liability simply because his retaliatory acts failed to deter the plaintiff from exercising constitutional rights.  The proper focus

18

is whether a person of "ordinary firmness" would have been deterred.

If the prisoner satisfies the first two elements, he must then prove a causal link between his constitutionally protected conduct and the adverse action.  Rauser, 241 F.3d at 333.  The causation element consists of a burden-shifting framework.  First, the prisoner must prove his constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  In proving that his constitutionally protected conduct was a substantial or motivating factor, the plaintiff may present direct evidence of the defendant's motive, although this is not essential.  The prisoner may rely on circumstantial evidence, such as "suggestive temporal proximity" between the protected conduct and the adverse action.  Rauser, 241 F.3d at 334 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)).[8]  However, temporal proximity is insufficient "when the temporal relationship is not 'unusually suggestive.'"  Farrell, 206 F.3d at 280 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).  In the absence of unusually suggestive timing, the plaintiff may point to a evidence of a retaliatory animus or intervening antagonism, see Kachmar v. SunGuard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997); Alexander v. Forr, Civ. A. No. 3:CV-04-0370, 2006 WL 2796412, at *21 (M.D. Pa. Sept. 27,

---

[8]Decisions addressing the causation element of retaliation claims brought in the employment context are instructive in the First Amendment setting.  See, e.g., Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002); Rauser, 241 F.3d at 334; McKinnie v. Conley, Civ. A. No. 04-932, 2006 WL 1687037, at *6 (E.D. Pa. June 12, 2006).

2006), or evidence that the prison official proffered inconsistent reasons to justify the adverse action.  See E.E.O.C. v. L.B. Foster Co., 123 F.3d 746, 753 (3d Cir. 1997).

The Court in Rauser also acknowledged that prison administration is an unenviable task, and that decisions of prison officials should be afforded deference.  Rauser, 241 F.3d at 334. Therefore, if the prisoner proves that his constitutionally protected conduct was a substantial or motivating factor for the adverse action, the defendants may prevail if they prove by a preponderance of the evidence "that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Id.

Against this backdrop, the Court will address Mr. Brooks' two retaliation claims.

**B. Officer Rodgers and the Cardboard Sign**

Mr. Brooks alleges that Officer Rodgers posted a cardboard sign in his cell door window labeling him a "snitch" in retaliation for filing an administrative grievance.  Officer Rodgers argues he is not liable because he did not place the cardboard sign in Mr. Brooks' cell door window, the cardboard sign does not constitute adverse action, and Mr. Brooks cannot establish a causal link between the cardboard sign and the administrative grievance.

It is unnecessary to resolve Officer Rodgers' first two contentions because, assuming he placed the cardboard in Mr. Brooks' cell door window, Mr. Brooks has not shown that the April 17, 2003, administrative grievance was "a substantial or motivating factor" in Officer Rodgers' decision to post the cardboard in Mr. Brooks' cell window.  Clearly, timing will not establish the

20

causal link between the administrative grievance and Officer Rodgers' conduct.  Approximately one year elapsed before Officer Rodgers took any retaliatory action against Mr. Brooks.  Thus, the temporal relationship is not "unusually suggestive."  Moreover, Mr. Brooks adduced no evidence from which a retaliatory animus could be inferred, and there was no evidence of any intervening antagonism or hostility between Mr. Brooks and Officer Rodgers.  In this regard, Mr. Brooks found Officer Rodgers' actions "surprising," given the tranquil period following the administrative grievance.  Consequently, Mr. Brooks has failed to establish a causal connection between the administrative grievance and the cardboard sign, and the Court will enter judgment in favor of Officer Rodgers on this claim.

### C. The SHU Placement

Mr. Brooks' other claim is that A.W. Levi and Lt. Gabrielson placed him in the SHU in retaliation for filing a federal civil rights lawsuit and administrative grievances against prison staff. A.W. Levi and Lt. Gabrielson argue that Mr. Brooks' placement in the SHU does not constitute adverse action, and that it was not causally connected to the exercise of his constitutional rights. These elements will be addressed in turn.

#### 1) Adverse Action

To prevail on a retaliation claim, the prisoner must prove the action taken by a prison official "'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'"  Rauser, 241 F.3d at 333 (quoting Allah, 229 F.3d at 225).  Whether a person of ordinary

firmness would be deterred is a question of fact.  See Allah, 229 F.3d at 225; Suppan v.

Dadonna, 203 F.3d 228, 235 (3d Cir. 2000).

Our Court of Appeals has held that confinement in administrative segregation could

constitute adverse action supporting a retaliation claim.  See Atkinson v. Taylor, 316 F.3d 257,

270 (3d Cir. 2003); Allah, 229 F.3d at 225; see also Mincy, 2007 WL 707344, at *6.  Proof of this

element "will depend on the facts of the particular case."  Allah, 229 F.3d at 225.

In Allah, the plaintiff alleged he was confined in administrative segregation because he

filed a civil rights lawsuit against prison officials.  His confinement in administrative segregation

resulted in conditions similar to those experienced by Mr. Brooks: reduced access to telephone

calls, the commissary, and recreation; elimination of access to rehabilitative programs; and

restricted access to legal materials and assistance.  Id.  The court held that a fact finder could

conclude that continued confinement in administrative segregation under these conditions "would

'deter a person of ordinary firmness from exercising his First Amendment rights.'"  Id. (quoting

Suppan, 203 F.3d at 235).

In this matter, the Court finds that Mr. Brooks has proven by a preponderance of the

evidence that his placement and continued confinement in SHU would deter a person of ordinary

firmness from exercising his constitutional rights.  First, Mr. Brooks was confined in the  SHU for

approximately three-and-one-half months.  Confinement in administrative detention for a

significant period of time would have a strong deterrent effect on an individual who is

contemplating filing an administrative grievance or lawsuit.  See Hearn v. Arpaio, No. CV-03-

1924-PHX-MHM (MEA), 2007 WL 1381616, at *4 (D. Ariz. May 9, 2007) (placement in

administrative segregation for less than two months constitutes adverse action).

Second, placement in the SHU restricts an inmate's privileges that he would otherwise

enjoy in general population.  Mr. Brooks' access to recreation, telephone calls, and his personal

property, as well as his interaction with other inmates, were reduced while confined in the SHU.

Finally, confinement in the SHU results in reduced access to legal materials.  In Allah, the

Third Circuit emphasized this fact in holding that the plaintiff stated a claim for retaliation.  See

Allah, 229 F.3d at 225 ("confinement in administrative segregation resulted . . . in . . .

significantly, inadequate access to legal research materials and assistance") (emphasis added).

Here, an inmate confined in the SHU must wait as long as a week before he can obtain and file

an administrative grievance, and to access the law library he must sign a waiting list and stand

by until his turn arrives.

Defendants contend that adverse action is not established because Mr. Brooks actually

exercised his constitutional rights while in the SHU: he filed administrative grievances and

documents in his federal civil rights lawsuit.  The test for adverse action, however, is objective,

not subjective, and whether the plaintiff was actually deterred by the defendant's retaliatory acts

is not dispositive.  See Citizens for a Better Lawnside, 2007 WL 1557479, at *6; Cannon v.

Burkybile, No. 99-C-4623, 2002 WL 448988, at *6 (N.D. Ill. Mar. 22, 2002).  The inquiry is

whether a person of ordinary firmness would be deterred.  Here, Mr. Brooks has proven that the conditions of confinement in the SHU would deter a person of ordinary firmness from exercising his constitutional rights.  That Mr. Brooks actually exercised his constitutional rights proves nothing other than his extraordinary determination and commitment to file administrative grievances and pursue his federal lawsuit.

In summary, Mr. Brooks introduced credible evidence of the conditions of confinement in the SHU.  When considered in conjunction with the heightened stress that accompanies such confinement, it is clear that placement in the SHU would deter a person of ordinary firmness from exercising his constitutional rights.  Therefore, Mr. Brooks has established the adverse action element of a retaliation claim.

### 2) Causal Connection

Mr. Brooks presented direct evidence that A.W. Levi and Lt. Gabrielson placed him in the SHU because of his federal civil rights lawsuit and administrative grievances.  Mr. Brooks testified about the events that occurred in the lieutenant's office on May 4, 2004, testimony this Court deems credible.  After Mr. Brooks arrived at the lieutenant's office, A.W. Levi entered the office holding the two administrative grievances Mr. Brooks filed against Officer Keim.  A.W. Levi expressed his frustration over Mr. Brooks' complaints: "I'm getting sick and tired of your little write-ups and lawsuits against my staff members."  (Trial Tr. 54.)  Obviously, the "write-ups" refer to the administrative grievances, and the "lawsuits" refer to the federal civil rights lawsuit Mr.

Brooks commenced on April 12, 2004, the only lawsuit he had filed at this point.  A.W. Levi then

interrogated Mr. Brooks about his allegation concerning Officer Keim's inadequate rounds.  (Id.)

Afterwards, A.W. Levi and Lt. Gabrielson decided to place Mr. Brooks in the SHU.  "Well, we

gonna put you in the hole for a little while," said A.W. Levi, "and see if you'll cool off and change

your mind."  (Id.)  Lt. Gabrielson, knowing that Mr. Brooks was going to the SHU because he filed

the federal civil rights lawsuit and administrative grievances, completed an administrative

detention order purporting to justify Mr. Brooks' placement in SHU because of safety concerns.

This evidence alone, therefore, establishes that Mr. Brooks' constitutionally protected conduct

was a substantial or motivating factor for his placement in SHU.

Moreover, the timing of Mr. Brooks' placement in the SHU suggests that his lawsuit and

administrative grievances were the driving force.  Mr. Brooks filed the federal civil rights lawsuit

on April 12, 2004, and filed the administrative grievances against Officer Keim on April 16, 2004.

A.W. Levi and Lt. Gabrielson placed Mr. Brooks in the SHU on May 4, 2004, only a few weeks

after he exercised his constitutional rights.  This brief interval of time, therefore, indicates a

temporal proximity.  See Brachvogel v. Beverly Enters., Inc., 173 F. Supp. 2d 329, 331 (E.D. Pa.

2001) (temporal proximity where decision to terminate plaintiff made only a few weeks after she

notified defendant of her intent to file an EEOC complaint).

Furthermore, the testimony of A.W. Levi and Lt. Gabrielson regarding the events of May

4, 2004 is not credible.  Indeed, they offered conflicting, irreconcilable versions of the encounter

in the lieutenant's office.  Lt. Gabrielson testified that he learned from A.W. Levi about Ms.

Thompson's phone call in which she expressed concern for Mr. Brooks' safety in general

population.  (Trial Tr. 33, 73.)  He said that he summoned Mr. Brooks to the lieutenant's office on

May 4, 2004, and, after he arrived, questioned Mr. Brooks about the phone call.  (Id.)  He asserts

that Mr. Brooks refused to discuss the phone call, but stated simply that he feared for his safety

in general population.  (Id.)  Mr. Brooks offered no indication whether he feared an inmate or a

staff member.  (Id. at 36.)  Lt. Gabrielson testified further that A.W. Levi was present during this

meeting, and that he posed similar questions to Mr. Brooks, eliciting the same vague answers.

(Id. at 73, 88.)  A.W. Levi and Lt. Gabrielson agreed that Mr. Brooks should be placed in the SHU

pending an investigation into his safety concerns, and at that point – when the interrogation of

Mr. Brooks terminated – Lt. Gabrielson completed the administrative detention order authorizing

Mr. Brooks' placement in SHU.  (Id. at 73.)

        A.W. Levi offered testimony that conflicted with Lt. Gabrielson's and at times contradicted

his own testimony.  A.W. Levi was informed on May 3, 2004, of Ms. Thompson's phone call, in

which she expressed unease over Mr. Brooks' safety because staff members were harassing

him.  (See id. at 124-25.)  Yet, A.W. Levi informed Lt. Gabrielson only about her generalized

concern for Mr. Brooks' safety.  On the following morning, A.W. Levi "coincidentally" came

across an informal resolution, filed by Mr. Brooks, complaining that a staff member was

harassing Mr. Brooks with pat searches.  (Id. art 108, 112.)  A.W. Levi could not describe this

26

informal resolution, except to say that "we" – the Defendants – have a copy somewhere.  (Id. at 109, 111.)  In any event, A.W. Levi says he never told Lt. Gabrielson about the informal resolution.  When A.W. Levi spoke to Mr. Brooks, the latter was "not very talkative[.]  I wasn't sure what it was that you were trying to tell us about your safety and that you were in danger, so we erred on the side of caution and put you in SHU pending an investigation."  (Id. at 108.) Curiously, according to A.W. Levi, the investigation was undertaken to ascertain who was threatening Mr. Brooks, even though the informal resolution reviewed by A.W. Levi complained of harassment by a staff member.  (Id. at 113.)

        A.W. Levi then was shown the "informal resolution" that he reviewed the morning of May 4.  (Id. at 125-26, 129; see also PX-9; DX-D, at 3.)  This "informal resolution" is actually the Request for Administrative Remedy number 331321-F1 filed by Mr. Brooks that alleged Officer Keim conducted inadequate rounds; Mr. Brooks did not complain that he was being harassed by Officer Keim or any other staff member.  (See PX-9.)  When confronted on cross-examination, A.W. Levi conceded that PX-9 did not indicate Mr. Brooks was harassed by staff members.  (See Trial Tr. 131 ("I'm sorry, I didn't get it from this information.").)  Instead, PX-9 merely informed his determination to summon Mr. Brooks in the first place.  (Id. at 129-30.)  A.W. Levi then explained how he learned of the harassment: "You [Mr. Brooks] told me [in the lieutenant's office] that you were being harassed by staff and that you felt that the cell searches and the pat searches were harassment."  (Id. at 133.)  A.W. Levi testified earlier that Mr. Brooks was not "talkative" in the

lieutenant's office, but now stated that Mr. Brooks insisted repeatedly "that staff aren't doing their job, make them do their job, make them do their rounds, and he was in danger because he was getting pat-searched and his cell was being searched." (Id. at 127.)  This testimony, of course, is inconsistent with Lt. Gabrielson's story that Mr. Brooks never provided an "inkling" as to why he was in danger.  A.W. Levi claimed that Lt. Gabrielson must not have heard this because he was not present for A.W. Levi's and Mr. Brooks' entire conversation.  (Id. at 131-32.)  Lt. Gabrielson, however, testified that A.W. Levi spoke to Mr. Brooks in his presence.

Lt. Gabrielson was recalled to the witness stand and attempted to mold his testimony around A.W. Levi's.  Although he reiterated his earlier testimony that Mr. Brooks never offered any indication why he feared for his safety, he now testified for the first time that he returned to his desk for a period while Mr. Brooks and A.W. Levi continued conversing.  (Id. at 136.)  This conversation occurred on the "other side of the office," purportedly outside of Lt. Gabrielson's hearing.  (Id.)  The lieutenant's office is not large – it seats three or four desks – and there is no reason to believe Mr. Brooks and A.W. Levi were whispering.  Nevertheless, Lt. Gabrielson obstinately denied overhearing their conversation.  (Id. at 138.)  Lt. Gabrielson also stated that when he returned to his desk in the middle of Mr. Brooks' and A.W. Levi's conversation, he began preparing the administrative detention order.  (Id. at 136.)  When that conversation concluded, A.W. Levi exited the office, and Lt. Gabrielson completed the detention order, which included a request that Mr. Brooks sign the order.  (Id. at 137.)  This contradicted his earlier

28

testimony, where he stated that the administrative detention order was prepared <u>after</u> the

interrogation of Mr. Brooks.  (<u>See</u> <u>id.</u> at 73.)

The Administrative Remedy Response issued on July 6, 2004, also supports the

conclusion of dissembling by Levi and Gabrielson.  Mr. Brooks filed Request for Administrative

Remedy number 335609-F1, complaining that his placement in the SHU was punishment for

filing grievances.  (PX-8.)  Warden Smith responded that an investigation revealed Mr. Brooks

filed on May 4, 2004, a request for administrative remedy, claiming that a staff member harassed

him by conducting pat searches that were "sexual in nature."  (PX-1.)  The response also

asserted that Mr. Brooks had claimed that he feared for his safety around this staff member.  (<u>Id.</u>)

This response is problematic.  There is no record that Mr. Brooks submitted an administrative

grievance on May 4.  The administrative grievances that he filed prior to May 4 concerned Officer

Keim's inadequate rounds and smoking in a prohibited area, not harassment by a staff member.

(<u>See</u> PX-9 & PX-10.)  The administrative grievance filed on May 7, 2004, complained of

harassment by Officers Keim and Rodgers in connection with pat searches and cell searches,

but did not claim the pat searches were "sexual in nature."  (<u>See</u> PX-5.)  Finally, Mr. Brooks

never stated during the May 4 meeting in the lieutenant's office that he was afraid of Officer Keim

or Officer Rodgers.  It is worth noting that the administrative response fails to mention Ms.

Thompson's phone call.

Mr. Brooks was a credible witness, his testimony was consistent and supported by the

documents, and his version of the May 4, 2004, meeting in the lieutenant's office is plausible and sensible.  Consequently, the Court finds by a preponderance of the evidence that Mr. Brooks' constitutionally protected conduct was a substantial or motivating factor behind the decision to place him in SHU.

This conclusion does not end the inquiry, however, because Defendants can still prevail by proving "that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334. Defendants argue that Mr. Brooks was placed in the SHU for his own safety in order to investigate his allegations that he was harassed by Officers Keim and Rodgers.

At the time the decision was made to place Mr. Brooks in the SHU on May 4, 2004, Mr. Brooks had not filed any complaints against Officers Keim and/or Rodgers alleging harassment, and he did not mention this during the meeting.  Thus, Defendants cannot demonstrate they would have taken the same action on May 4, 2004, in the absence of the protected conduct.  To be sure, Mr. Brooks filed Request for Administrative Remedy number 332596-F1, alleging he was harassed by Officers Keim and Rodgers in the form of pat searches and cell searches.  This grievance, however, was not filed until May 7, 2004, three days after the decision to place Mr. Brooks in the SHU.  Moreover, the Court is skeptical that Defendants would have made the same decision had they known of the alleged harassment because A.W. Levi testified that it is not standard procedure to be place an inmate in the SHU when he files an informal resolution or

administrative remedy against a staff member.  Therefore, Defendants have not sustained their

burden to prove they would have made the same decision absent Mr. Brooks' federal civil rights

lawsuit and administrative grievances.

In summary, Mr. Brooks has established the elements of a retaliation claim by a

preponderance of the evidence.  Accordingly, A.W. Levi and Lt. Gabrielson are liable to Mr.

Brooks on his retaliation claim.[9]

---------------------------------------

[9]A.W. Levi and Lt. Gabrielson contend they are entitled to qualified immunity.  There is no merit to this contention.  "Qualified immunity insulates government officials performing discretionary functions from suit insofar as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"  McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987).  This analysis involves two steps.  First, the court must determine whether the government officials' conduct violated a constitutional right.  Atkinson, 316 F.3d at 261 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Here, the Court has found that A.W. Levi's and Lt. Gabrielson's decision to place Mr. Brooks in the SHU because he filed a federal civil rights lawsuit and administrative grievances violated his First Amendment rights.

Having answered affirmatively the first question, the Court must consider whether this right was clearly established as of May 4, 2004.  Id. (quoting Saucier, 533 U.S. at 201).  The answer here is also "yes."  In Milhouse, 652 F.2d at 373-74, our Court of Appeals held that a prisoner has the right to access the courts "without hind[r]ance or fear of retaliation."  See also Mitchell, 318 F.3d at 530 (prisoner has right to file administrative grievance without retaliation).  And in Allah, the Third Circuit held in 2000 that a prisoner alleging he was placed in administrative segregation for filing a civil rights lawsuit states a First Amendment retaliation claim.  Allah, 229 F.3d at 225; see also Atkinson, 316 F.3d at 270 (defendants not entitled to qualified immunity where, among other things, they moved inmate into administrative segregation because he filed a civil rights lawsuit against them).  Therefore, on May 4, 2004, it was clearly established that Defendants' conduct was unlawful

Because A.W. Levi and Lt. Gabrielson violated a clearly established constitutional right,
(continued...)

### 3) Damages

Having found A.W. Levi and Lt. Gabrielson liable on Mr. Brooks' retaliation claim, the

Court must determine what damages, if any, should be awarded to Mr. Brooks.  At the final pre-

trial conference, the Court ruled that Mr. Brooks may not recover compensatory damages.  (Trial

Tr. 11-12.)  That ruling, however, does not foreclose recovery of other types of damages, such as

nominal damages.  In Allah v. Al-Hafeez, the Third Circuit observed "that certain absolute

constitutional rights may be vindicated by an award of nominal damages in the absence of any

showing of injury warranting compensatory damages." 226 F.3d at 251 (citing Memphis Cmty.

Sch. Dist. v. Stachura, 477 U.S. 299, 308 n.11 (1986); Carey v. Piphus, 435 U.S. 247, 266

(1978)).  Nominal damages are routinely awarded for violations of First Amendment rights.  Id.

Here, Mr. Brooks has prevailed on his First Amendment retaliation claim.  Consequently, Mr.

Brooks is entitled to nominal damages of $1.

"Punitive damages may also be awarded based solely on a constitutional violation,

provided the proper showing is made." Allah v. Al-Hafeez, 226 F.3d at 251.  Punitive damages

are available in a Bivens action, see Carlson v. Green, 446 U.S. 14, 21-22 (1980), and the

standard is that applied in § 1983 actions.  See Alexander v. Pa. Dep't of Banking, No. Civ. 93-

5510, 1994 WL 144305, at *6 & n.7 (E.D. Pa. Apr. 21, 1994).  Thus, punitive damages may be

---

[9](...continued)
no reasonable prison official would conclude that their actions were lawful.  Accordingly, they are
not entitled to qualified immunity.

awarded "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Coleman v. Kaye, 87 F.3d 1491, 1497 (3d Cir. 1996) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  This standard is disjunctive, and the plaintiff need show only that the defendant's conduct was reckless or callous.  Eichenlaub v. Twp. of Indiana, 214 F. App'x 218, 223 (3d Cir. 2007).

In a First Amendment retaliation case, proof that the defendant acted with a retaliatory motive, with nothing more, is insufficient to award punitive damages.  Brennan v. Norton, 350 F.3d 399, 429-30 (3d Cir. 2003).  As the court in Brennan observed, a showing of at least recklessness or callousness is required, otherwise "any finding of retaliatory motive would automatically support punitive damages." Id. at 429.  To meet this threshold, the plaintiff must present evidence that the defendant singled out the plaintiff "for intentional disparate treatment," that the defendant followed "unusual procedures" in retaliating against the plaintiff, or that the defendant acted vindictively.  Springer v. Henry, 435 F.3d 268, 281-82 (3d Cir. 2006).  Cf. Brennan, 350 F.3d at 426, 429-30 (award of punitive damages not justified, even though defendant filed disciplinary charges against and sanctioned the plaintiff and recommended no extension of the plaintiff's leave time, where there was no evidence that defendant acted with the required heightened culpability).

In this matter, the evidence does not justify an award of punitive damages against A.W.

Levi or Lt. Gabrielson.  Although Mr. Brooks proved that his federal civil rights lawsuit and

administrative grievances were a substantial or motivating factor for the decision to place him in

the SHU, he has not offered evidence to support a conclusion that Defendants acted with

recklessness or callousness, let alone evil motive.  There was no evidence that Mr. Brooks was

singled out for "disparate treatment" or that Defendants acted vindictively.  Furthermore, beyond

this single instance of retaliation, there is no evidence that A.W. Levi or Lt. Gabrielson took

further retaliatory measures against Mr. Brooks.  Cf. Tate v. Dragovich, No. Civ. A. 96-4495,

2003 WL 21978141, at *8 (E.D. Pa. Aug. 14, 2003) (upholding jury's award of punitive damages

where prison official committed multiple acts of retaliation over an extended period).  And while it

was not standard procedure to place an inmate in the SHU simply because he filed an informal

resolution or administrative grievance against a staff member, the placement of an inmate in the

SHU – albeit for legitimate penological interests – is not unusual at USP-Lewisburg.  In other

words, this case is closer to Brennan than Springer.  Accordingly, because Mr. Brooks failed to

prove Defendants acted with the requisite heightened culpability, there will be no award of

punitive damages.

## III. CONCLUSION

        For the reasons set forth above, judgment will be entered in favor of Officer Rodgers and

against Mr. Brooks on his retaliation claim involving the cardboard sign.  Judgment will be

entered in favor of Mr. Brooks and against A.W. Levi and Lt. Gabrielson on his retaliation claim

involving placement in SHU in the amount of $1.  An appropriate Order follows.


**s/ Thomas I. Vanaskie**

Thomas I. Vanaskie
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LOVE ALTONIO BROOKS** | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-04-2680** |
| | : | **(JUDGE VANASKIE)** |
| **JOSEPH V. SMITH, TROY LEVI,** | : | |
| **R. HOEKMAN, K. GABRIELSON,** | : | |
| **M. RIOS, J. RODGERS** | : | |
| **Defendants** | : | |

## ORDER

**NOW, THIS 5th DAY OF NOVEMBER, 2007,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Judgment shall be entered in favor of Jeffrey Rodgers and against Love Altonio Brooks.

2. Judgment shall be entered in favor of Love Altonio Brooks and against Troy Levi and Kenneth Gabrielson in the amount of $1.00.

3. The Clerk of Court is directed to mark this action **CLOSED**.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge